**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **JODI LASHER,** | ) | **CASE NO. 1:15CV00005** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | **OPINION AND ORDER** |
| | ) | |
| **MEDINA HOSPITAL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |


**CHRISTOPHER A. BOYKO, J.**:

This matter comes before the Court upon the Motion (ECF DKT #18) of Defendants,

Medina Hospital and Cleveland Clinic Foundation (erroneously named as "Cleveland Clinic

Company"), for Summary Judgment.  For the following reasons, the Motion is granted.

## I. FACTUAL BACKGROUND

Medina Hospital is a 180-bed hospital which has been affiliated with the Cleveland

Clinic Health System since 2009.  The Hospital's Family Birthing Center ("FBC") offers care

to mothers and infants during labor, delivery, recovery and postpartum.

Plaintiff, Jodi Lasher, has been a Registered Nurse for over thirty years and she was

hired to work as a Staff Nurse on the obstetrical floor of Medina Hospital on June 3, 2013.

She worked the night shift, from 7:00 p.m. to 7:30 a.m.  Among other things, she was responsible for monitoring the mothers' vital signs and contractions and the babies' fetal heart rates.  Plaintiff's direct supervisor was Debra Miskell.

Plaintiff suffers from chronic migraines.  She experiences more than fifteen headaches in a month and migraine symptoms nearly every day.  (Lasher Depo., ECF DKT #25 at p. 35).  Sometimes, the headaches will present themselves with stabbing pain or visual auras, and other times, with a disruption in equilibrium.  In addition to pain, Plaintiff can experience nausea, dizziness and vertigo.  (*Id*. at pp. 35-36).  To control the migraines and to improve the quality of her life, Plaintiff takes preventative and abortive medications.  Plaintiff can succumb to a disabling migraine, but that occurrence is uncertain and unpredictable.

From time to time, Plaintiff alleges that she would need to report off from work.  The Hospital followed a "no-fault" attendance policy; so, points would be assessed to the employee for unscheduled and/or unapproved absences.  Plaintiff received a corrective action in the form of documented counseling in February of 2014 and incremental discipline in the form of a written warning in June of 2014, due to her absences.  In the spring of 2014, Hospital management also received complaints that Plaintiff was disappearing from her unit, that co-workers were unable to find her, and that she was improperly using the call room during her shift.  Plaintiff admits that, on at least one occasion, she had removed herself from the FBC to "rest her eyes."  (*Id*. at p. 30).  Rather than impose any discipline, Miskell and Human Resources Generalist Mallory Houdek met with Plaintiff to address the situation and to discuss Plaintiff's need for accommodations due to her migraines.  Houdek gave Plaintiff paperwork, including a request for information from her health care provider, a medical

release form, a copy of her job description, and Family Medical Leave Act ("FMLA") forms.

After reviewing the paperwork, Plaintiff informed Houdek that accommodations were not applicable to her situation.  Rather, she needed intermittent FMLA leave and would wait until she became FMLA-eligible on her anniversary date.

Houdek and Miskell emphasized to Plaintiff that it was inappropriate to remove herself from her patients in the unit when she began to experience migraine symptoms.  The proper procedure required Plaintiff to let the Nurse Operations Manager ("NOM") know, or if that person was unavailable, one of her colleagues, that she needed to remove herself for a period of time.  This was for her own safety and that of the patients under her care.  Plaintiff acknowledged that she understood the proper procedure and she agreed to follow it in the future.  (Houdek Depo., ECF DKT #22 at pp. 74-75; Lasher Depo., ECF DKT #25 at p. 30).

As soon as she became eligible on June 6, 2014, Plaintiff's request for intermittent FMLA was approved.  She was granted all the FMLA leave she requested, including an occasion when she developed migraine symptoms during her shift.  (Lasher Depo., ECF DKT #25 at pp. 34-35).  From June 2014 until her termination, Plaintiff received no discipline and was given positive performance feedback from her supervisor, Ms. Miskell.  (*Id*. at pp. 24-25).

On September 21, 2014, Plaintiff reported for work at 7:00 p.m. and was scheduled to work until 7:30 a.m. on September 22, 2014.  In addition to Plaintiff, Anna Diliberto, Andrea DeStefanis and two other RN's were working in the FBC.  It was a busy evening in the unit, with Plaintiff assisting DeStefanis with an emergency delivery.  Between 8:00 and 8:30 p.m., Plaintiff was assigned to a labor patient in Room 280 in Alcove Three of the FBC.

At approximately midnight, Plaintiff experienced a visual aura.  The bright lights caused her some difficulty; so, she decided to watch the fetal heart monitor in an unused patient room across the hall, Room 278.  Around the same time, Plaintiff told her co-worker, Diliberto: "This isn't a good night to get a headache."  (*Id*. at p. 43).  Plaintiff remained in Room 278 for thirty to thirty-five minutes.  Room 278 is about fifteen steps away from Room 280 and five steps away from the nurses' desk.  Plaintiff believed there was no policy against sitting in the dimmed room near the nurses' desk and she believed it was an accommodation that she was allowed to make for herself.  (*Id*.).

At approximately 1:00 a.m., Plaintiff experienced a "balance disturbance" and nausea. These are symptoms Plaintiff commonly suffers and they do not necessarily result in more serious issues.  Nevertheless, Plaintiff decided to take her prescribed medications for migraines and nausea "to abort any migraine that may be developing."  (*Id*. at p. 44; ECF DKT #29 at 11).

About an hour later, Plaintiff went to check on her patient who expressed concern that her contractions had stopped.  (*Id*. at p. 45).  Plaintiff reassured her and told her that the doctors would decide what to do in the morning.  (*Id*.).  While talking with her patient, Plaintiff became "hot and flushed and dizzy."  (*Id*.).  She left her patient's room, went to Room 278, sat on the foot of the unused bed, closed her eyes and collapsed completely onto the bed.  (ECF DKT #25-1 at p. 45).

Sometime between 2:00 and 3:00 a.m., the other nurses noticed that the fetal heart rate of Plaintiff's patient's baby was not tracing on the monitor.  (DeStefanis Depo., ECF DKT #21 at p. 6).  One nurse went to Room 280 to check on the patient and DeStefanis looked for

Plaintiff:

> A.  I went into the room and she was sleeping on the bed.
>
> Q.  How do you know she was sleeping and not passed out?
>
> A.  Because when I shook her and said, "Hey, Jodi, are you okay?"  She said, " I must
>     have fallen asleep."

(DeStefanis Depo., *id*.).

Tonya Martin, the nursing supervisor on duty ("NOM"), asked Plaintiff if she was dizzy and if she wanted to go the emergency room.  After Plaintiff completed some charting, Martin escorted her to the ER, where she received treatment for her migraine condition. Martin determined that the heart rate of Plaintiff's patient's unborn baby had not been tracing on the fetal heart monitor for twenty-four minutes.

Because Plaintiff was scheduled to work on September 24, 2014, she called in on September 23, 2014 and informed the Hospital that she was "still ill."  She did not provide details about the episode on September 22, 2014 because "when you're in the throws (sic) of a migraine, you can't have those conversations with people, you can't."  (ECF DKT #25-1 at p. 24).

Ms. Miskell attempted to contact Plaintiff and set up a meeting multiple times in the days following September 22, 2014, by email and messages left on Plaintiff's cell phone and home phone.  (ECF DKT #25-16).  The meeting was not arranged until September 29, 2015 because Lasher was "trying to get through a migraine crisis," did not read her emails, had not set up voice mail on her cell phone and did not use her home phone.  (ECF DKT #25-1 at pp. 15, 19).

On September 29, 2014, Plaintiff met with Miskell and Houdek in the Hospital's Human Resources Office.  Plaintiff was informed that, according to Human Resources Enterprisewide Policies and Procedures (ECF DKT #19-1), sleeping while on duty is considered a major infraction; therefore, she was terminated effective immediately.  (ECF DKT #25-16, Exhibit P).  Plaintiff pursued an internal appeal process and her termination was upheld.

Plaintiff filed the instant lawsuit on January 2, 2015, alleging FMLA Interference and FMLA Retaliation under 29 U.S.C. § 2615(a) and Disability Discrimination under Ohio Revised Code Chapter 4112.  Defendants filed their Motion for Summary Judgment on September 30, 2015.  Plaintiff's Memorandum in Opposition was filed on November 4, 2015.  Defendants' Reply Brief was filed on November 16, 2015.

## II. LAW AND ANALYSIS

### Standard of Review

Summary judgment shall be granted only if  "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed.R.Civ.P. 56(a).  The burden is on the moving party to conclusively show no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." *See* Fed.R.Civ.P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). A fact is material only if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson*, 477 U.S. at 249-50; and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass 'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**FMLA Claims**

The FMLA protects employees who have worked for the same employer for at least one full year and who have provided at least 1,250 hours of service within that time period. 29 U.S.C. § 2611(2)(A).  Eligible employees are entitled to take twelve weeks of leave per year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  A "serious health condition," is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  A serious health condition includes chronic conditions which are defined as "any period of incapacity or treatment for such incapacity due to a chronic serious health condition."  29 CFR § 825.115(c).  A chronic serious health condition is one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a
> health care provider, or by a nurse under direct supervision of a health care
> provider;
> (2) Continues over an extended period of time (including recurring episodes of
> a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g.,
> asthma, diabetes, epilepsy, etc.).

> *Id*.

Plaintiff has pled both an interference claim under 29 U.S.C. § 2615(a)(1) and a retaliation claim under 29 U.S.C. § 2615(a)(2), both of which are recognized theories of

recovery in the Sixth Circuit for alleged violations of an employee's FMLA rights. *See Killian v. Yorozu Auto Tenn. Inc.*, 454 F.3d 549, 555 (6th Cir. 2006).

In the Sixth Circuit, it is appropriate to apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to both FMLA interference and retaliation claims when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse employment action. *Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008).

The circumstantial approach requires the plaintiff to present a prima facie case, which then creates a rebuttable presumption of violation of FMLA rights. *See McDonnell Douglas,* 411 U.S. at 802; *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 & n.6 (1981). The burden at the prima facie stage is not an onerous one, and it is easily met. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000). "The burden of proof at the prima facie stage is minimal; all that the plaintiff must do is put forth some credible evidence that enables the court to deduce" each element of the claim. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Next, the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). At the pretext stage, "the burden of producing evidence of pretext essentially merges with the burden of persuasion, which always lies with the plaintiff." *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (quoting *Wilkins v. Eaton Corp.*, 790 F.3d 515, 522 (6th Cir. 1986)). A plaintiff may demonstrate pretext by showing that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or

(3) was insufficient to warrant the challenged conduct."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

## FMLA Retaliation

To establish a prima facie case of FMLA retaliation, Lasher must show that: (1) she engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.  *Killian*, 454 F.3d at 556 (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).

## Prima Facie Case

Plaintiff suffered a debilitating migraine while on duty on September 21-22, 2014, which she contends resulted in her losing consciousness.  The Hospital knew of her chronic health condition and granted her intermittent FMLA leave for that condition.  She told the NOM, Tonya Martin, that she had a headache when Martin escorted her to the emergency room that night; and in the ER, she was treated for migraines.  (Martin Depo., ECF DKT #20 at p. 4; ECF DKT #32-2).  Plaintiff was terminated effective September 29, 2014, a week after the occurrence.  "[S]uch temporal proximity between the events is significant enough to constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-525 (6th Cir. 2008).  Therefore, Plaintiff has satisfied her minimal burden for a prima facie FMLA retaliation claim.

## Legitimate, Non-Discriminatory Reason

-10-

The Hospital terminated Plaintiff for sleeping on the job when she was responsible for the care of a patient in labor.  This conduct constituted a major infraction of the Human Resources Enterprisewide Policies and Procedures, for which an employee could either be suspended or terminated.  (ECF DKT #19-1).

The Sixth Circuit, in a number of unpublished opinions, has determined that sleeping on the job is a legitimate, nondiscriminatory basis for termination when the employer has a clearly-established policy.  *James v. ABX Air, Inc*., No. 1:03-CV-00480, 2006 WL 783465 at *5 (S.D.Ohio Mar.23, 2006) (collecting cases).

Thus, Defendants have articulated their legitimate, non-retaliatory reason for terminating Plaintiff from her position.

**Pretext**

In order to prove pretext, Plaintiff must set forth more than a dispute over the facts upon which her discharge was based.  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).  Moreover, unlike at the prima facie stage, "the law in this circuit is clear that the temporal proximity cannot be the sole basis for finding pretext."  *Donald v. Sybra, Inc*., 667 F.3d 757, 763 (6th Cir.2012).

Plaintiff contends that Defendants' proffered reasons for terminating her employment have no basis in fact, or did not actually motivate, or were insufficient to motivate, the Hospital's decision.

Plaintiff insists that she suffered a sudden, incapacitating migraine while working her shift in the FBC on September 21-22, 2014.  According to Plaintiff, the Hospital did not conduct an adequate investigation in the few days before September 29, 2014, nor thoroughly

-11-

inquire of her or of any witnesses to justifiably support the determination that she had intentionally fallen asleep while on duty.

For its part, the Hospital demonstrates that all of the information before it indicated that Plaintiff abandoned her patient and was found sleeping.  Between 2:00 and 3:00 in the morning, co-workers noticed that the Plaintiff's patient's fetal heart rate was not registering on the monitor; and upon investigation, they discovered Plaintiff on a bed in a darkened, unoccupied patient room and positioned in a manner which would have allowed her to watch the fetal monitor.  (DeStefanis Depo., ECF DKT #21 at p. 6; Diliberto Depo., ECF DKT #23 at p. 14).  When Nurse DeStefanis shook Plaintiff and asked if she was "okay," Plaintiff said: "I must have fallen asleep."  (ECF DKT #21 at p. 6).  Plaintiff herself testified that: "I didn't know I was sleeping."  (ECF DKT #25-1 at p. 2).  Plaintiff did not return the Hospital's telephone calls, voice-mails or email messages between September 22 and September 25, 2014.  Yet, on September 23, 2014, Plaintiff sent a Facebook message to Nurse DeStefanis saying: "I feel like I may get in a lot of trouble for this.  We were busy and I was hoping to feel better instead of throwing in the towel.  I misjudged myself and I am sorry for that." (ECF DKT #25-15).

When the employer can demonstrate an honest belief in its proffered reason, the inference of pretext is unwarranted.  *See Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998); *Joostberns v. United Parcel Services, Inc.*, 166 F.App'x 783, 791 (6th Cir. 2006).  Thus, the Sixth Circuit has adopted the "honest belief rule."  *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).  So long as an employer honestly believed its proffered reason, an employee cannot show pretext, even if the facts are later

-12-

shown to be incorrect. *Segel v. Kimberly-Clark Corp.*, 473 F.App'x 416, 421 (6th Cir. 2012); *Smith*, 155 F.3d at 806. When "deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith,* 155 F.3d at 807.

Courts may not second-guess the business judgment of an employer but must instead determine "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004). "Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Corell v. CSX Transp., Inc.*, 378 F.App'x 496, 505 (6th Cir. 2010) quoting *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 399 (6th Cir. 2009).

Although Plaintiff disputes the Hospital's proffered reason that she intentionally removed herself from her labor patient's room and went to sleep across the hall, Plaintiff has not put forth evidence which demonstrates that the Hospital did not "honestly believe" the facts before it and the eyewitness accounts of Plaintiff's co-workers.

Plaintiff also attacks the credibility of the Hospital's proffered reason and denies that it created sufficient cause for the adverse employment action. Plaintiff asserts that the Hospital applied the Human Resources Enterprisewide Policies and Procedures selectively by giving preferential treatment to Anna Diliberto, a similarly situated worker who is not disabled and who did not exercise her FMLA rights. Diliberto received an unpaid suspension

-13-

in May of 2014, for administering Pitocin medication to a patient without a doctor's order and for improperly hooking up an IV pump, ultimately resulting in her patient undergoing an emergency C-section.

   To succeed in showing that the Hospital's reason was insufficient and therefore pretextual, Plaintiff must present evidence that the comparator, Diliberto, was not fired even though she engaged in ***substantially identical conduct*** to that which the Hospital contends motivated its discharge of Plaintiff. *Majewski*, 274 F.3d at 1117.  (Emphasis added). Diliberto believed that the doctor had approved a written order for Pitocin that another nurse had acknowledged.  In fact, there was no confirmation from the doctor to administer it. Diliberto had never made an error like this in twenty-nine years as an RN.  When deciding to impose a suspension rather than termination, the Hospital considered that Diliberto's actions were unintentional.  On the other hand, according to Human Resources Generalist, Mallory Houdek:

> [I]f you want to compare the two, Jodi abandoned her patient, didn't tell anyone that she was abandoning her patient, was found laying on a vacant patient bed and stated when she woke up, she didn't realize she had fallen asleep. . . . And in Anna's situation, based on, again, I don't have the details in front of me.  That was over a year ago.  It was determined that it was not intentional based on other factors that came into play.  (ECF DKT #22 at p. 39).

   Plaintiff concedes that the determination of whether a major infraction should result in a suspension or termination is left to the discretion of management.  (ECF DKT #29 at p. 17; ECF DKT #19-1).  Furthermore, Plaintiff has failed to show that the disciplinary policies of the Hospital were applied selectively, and that the Hospital's rationale for firing her was pretextual, because she and Diliberto did not engage in "substantially identical conduct."

-14-

*Majewski, id.*; *see Norton v. LTCH*, 620 F.App'x 408, 412 (6th Cir. 2015).

Plaintiff's third argument for pretext is that the Hospital was more likely motivated to terminate her employment because of retaliatory animus.  "A plaintiff must offer evidence sufficient to allow a reasonable juror to find that the employer was motivated by illegal reasons, considering both the employer's stated reasons and evidence the employer offers in support of such reasons."  *Majewski, id.*  Plaintiff points to instances when she was chastised by her supervisor, Debra Miskell:

> She did say to me, before, that my attendance affects the morale of the unit, has a poor effect on the morale of the unit.  And I felt that that was a little bit more detached and unfeeling.  (Lasher Depo., ECF DKT #25 at 26).

Also at ECF DKT #25-1 at p. 25:

> A. No, not directly.  I've had some hostile comments about my absenteeism, but not necessarily about the FMLA.
> Q. Okay. Those are the comments you told me about previously, that Ms. Miskell made about it affecting morale, your absenteeism?
> A. She said it has a negative impact on the morale of the unit, yeah.  And I've been told I don't use it correctly.

First, the Court notes that these comments by Miskell were made prior to Plaintiff applying for, and being granted, intermittent FMLA leave.  Secondly, Miskell and Plaintiff worked alongside each other in the FBC; and these comments reasonably reflect concern about the nurses in the unit doing their jobs responsibly and having all shifts appropriately covered.  In the Court's view, there is "no subtext of animus" in Miskell's comments.  "Isolated or ambiguous comments are too abstract to be considered as circumstantial evidence of discrimination in pretext analysis."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355-57 (6th Cir. 1998).

Furthermore, the evidence shows that the Hospital initiated discussions with Plaintiff

-15-

about accommodating her health condition; that the Hospital immediately approved Plaintiff's application for FMLA intermittent leave at her one-year anniversary; and prior to September of 2014, Plaintiff used intermittent FMLA leave without any problems.

The Court finds that Plaintiff has failed to demonstrate, by a preponderance of the evidence, that Defendants' proffered reason for the adverse employment action, i.e., termination, was pretextual. Plaintiff has not shown *both* that the Hospital's proffered reason was not the real reason she was fired, and that the real reason was retaliation for protected activity under the FMLA. Defendants are entitled to summary judgment in their favor on Plaintiff's FMLA Retaliation claim in Count One of her Complaint.

**FMLA Interference**

To establish a prima facie case of FMLA interference, Lasher must show that (1) she was an eligible employee; (2) the Hospital was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

**Prima Facie Case**

There is no dispute that Lasher was an eligible employee and that the Hospital was an employer under the FMLA. However, Defendants maintains that Plaintiff cannot successfully establish the third, fourth and fifth elements of her prima facie case of FMLA interference.

The Hospital argues that Plaintiff failed to demonstrate entitlement to intermittent FMLA leave. Under the FMLA, an employer may require that a request for leave be

-16-

supported by a certification issued by the health care provider. 29 U.S.C. § 2613. Fact discovery in this case revealed that Plaintiff herself completed the certification form based upon her recollection from a leave request for a previous employer. She then had her current physician sign it. The Hospital contends that this does not comply with the certification requirements of the FMLA and the supporting regulations, specifically, 29 CFR § 825.306 (2009).

The Court disagrees with Defendants' position. Upon review of the statutory sections and the applicable CFR provision, the Court only notes the use of the terms, "issue" or "issued" and "certify" or "certified" or "certification." Nowhere do the provisions state that the health care provider must "complete" the form. The Court is in accord with the District Judge in *Harcourt v. Cincinnati Bell Telephone Co.*, 383 F.Supp.2d 944, 954 (S.D.Ohio 2005):

> Nothing in § 2613(b) makes a certification insufficient if the employee happens to complete some or all of the information on the certification form. The critical point is that the certification be "issued " by the health care provider and contain the information required in § 2613(b), and in the Court's opinion, a certification is "issued" by a health care provider when he or she endorses the certification form, thus indicating agreement or adopting a belief that information contained in the form is accurate.

The Hospital's argument about the fourth element of the prima facie case, i.e., notice, raises a much closer question. The Hospital asserts that Plaintiff did not provide notice of her intention to take FMLA leave, despite an established procedure for notice to which Plaintiff agreed; despite several occasions she had to inform the Hospital that she was suffering from her FMLA-related condition during her shift on September 21-22, 2014; and despite the opportunity to respond to phone messages and emails from her supervisor in the days

-17-

following the incident.

"An employee seeking FMLA leave need not mention the statute expressly, but she must convey enough information to apprise her employer that she is requesting leave for a serious health condition that renders her unable to perform her job." *Norton*, 620 F.App'x at 410-11; *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). The FMLA does not require the Hospital to assume that the "illness" that caused Plaintiff to leave her patient and lie down on the bed in a dark, unused room across the hall stemmed from an FMLA-qualifying medical condition. *See Brenneman*, 366 F.3d at 423 n.9; *Brock v. United Grinding Techs., Inc.*, 257 F.Supp.2d 1089, 1102 (S.D.Ohio 2003).

Plaintiff, Miskell and Houdek met on April 30, 2014 to talk about Plaintiff's health issues and absences. Houdek testified as follows:

> . . . Deb made it very clear, we both made it very clear, the process that needed to happen was rather than utilizing the on-call room or taking herself away from the patients or away from the unit, she needed to let someone know that she needed to do that. So if she wasn't feeling well or if she was experiencing these symptoms, she needed to let the appropriate person know, which would have been the NOM, Nurse Operations Manager, whoever was working that shift. If that person wasn't able to be found and she needed to let someone else know, it was: let someone know whether it be one of your colleagues or someone that you are going to need to remove yourself for a period of time. So that, one, for her own safety, and two, for the safety of the patients that she would have been caring for at that time. And Jodi acknowledged that she agreed that that was appropriate.

(ECF DKT #22 at p. 20).

Around 12:00 a.m., during her shift on September 21-22, Plaintiff experienced a "visual disturbance" or aura. She told Nurse Diliberto: "This isn't a good night to get a headache" and she moved herself to an unoccupied patient room for 30 to 35 minutes. Plaintiff had this exchange at her deposition (ECF DKT #25 at p. 43):

Q.  Did you tell the nurse operations manager that you were going into the room at that point?

A.  Absolutely not.  I have no idea where the nurse operations manager was even at. It was an accommodation I made for myself because I could.

Q.  Why didn't you tell her?

A.  Why would I need to tell her?

Q.  That might be your answer to the question.  But why didn't you tell her?

A.  Number one, I had no reason to call her to talk to her about anything.  It was not any kind of big deal. Instead of sitting right here in the hallway watching the monitor, I'm sitting 15 steps away in a darker room watching a monitor. What difference does it make?

When asked if she contacted anyone to care for her patient, Plaintiff said:

No, I was, like, afraid I was going to faint. I wasn't one bit worried about my patient, I was worried about me.  (ECF DKT #25-1 at p. 4).

At approximately 1:00 a.m., Plaintiff decided to take medications for her migraine condition and for nausea; but she did not inform the NOM or a co-worker.  Another hour passed and Plaintiff checked on her patient who was concerned that her contractions had stopped.  Plaintiff felt dizzy and felt an urgent need to lie down.  She took herself to the unused room again, without using a call button or a phone; without alerting anyone at the nurses' station; and without asking for assistance for herself or her patient.  (ECF DKT #25 at p. 45).

When her co-workers discovered her twenty minutes or more later, Plaintiff said she did not know that she was sleeping.  She told no one that she experienced a sudden, incapacitating migraine.  (ECF DKT #25-1 at p. 2).

On September 23, 2014, Plaintiff's supervisor, Debra Miskell, left voice mails on

Plaintiff's home phone and cell phone and sent her an email message.  Plaintiff did not

respond to tell Miskell that she needed to request FMLA leave for the incident the prior day.

She called off for her September 24th shift but did not mention that she was suffering from

her FMLA-related condition.  (ECF DKT #25-1 at p. 24).  Houdek testified that the

appropriate notice was not given at any time leading up to, or even during the meeting on

September 29, 2014, at which Plaintiff was terminated.  (ECF DKT #22 at p. 33).

Although Plaintiff's burden, at the prima facie stage is not onerous, the Court finds

that Plaintiff has not put forth any credible evidence from which the Court can deduce that

she satisfies the element of notice of her intent to take leave.  Defendants are entitled to

summary judgment on Plaintiff's FMLA Interference claim in Count Two of her Complaint.

**Ohio Disability Discrimination**

In this Circuit, the *McDonnell Douglas-Burdine* burden-shifting framework applies to

employment discrimination claims brought under Ohio Revised Code Chapter 4112.  *Jones v.*

*Honda of America Mfg., Inc.*, No. 3:13-CV-167, 2015 WL 1036382 (S.D.Ohio Mar. 9, 2015)

(citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

> On a motion for summary judgment, a district court considers whether there is
> sufficient evidence to create a genuine dispute at each stage of the *McDonnell*
> *Douglas* inquiry.  The court first determines if a plaintiff has put forth
> sufficient evidence for a reasonable jury to find her to have met the prima facie
> requirements, including whether she has met the legitimate expectations of her
> employer. It performs the same function with respect to defendant's production
> of evidence, and again for the plaintiff's response to that production.

*Cline, supra.*

In light of the Court's determinations that Plaintiff cannot demonstrate that

Defendants' reason for terminating her was retaliatory, thus pretextual; and additionally, that

Plaintiff has failed to satisfy the prima facie burden for FMLA Interference, the *McDonnell*

*Douglas* analysis will necessarily defeat Plaintiff's Ohio claim in the same fashion.  Thus, Defendants are entitled to summary judgment on the Ohio Revised Code § 4112 Disability Discrimination claim in Count Three of her Complaint.

## III. CONCLUSION

For the foregoing reasons, the Motion (ECF DKT #18) of Defendants, Medina Hospital and Cleveland Clinic Foundation (erroneously named as "Cleveland Clinic Company"), for Summary Judgment is granted.  The Complaint is dismissed and the Jury Trial set for February 16, 2016 is cancelled.

**IT IS SO ORDERED.**

**s/ Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**United States District Judge**

**Dated:  February 5, 2016**